## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | **23 Cr. 379 (PKC)** |
| | § | |
| **VS.** | § | |
| | § | |
| **CHARLES RILEY CONSTANT** | § | Sentencing Hearing Date: 4/24/2024 |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Charles "Chuck" Riley Constant, by and through his counsel of record, respectfully submits this memorandum in aid of sentencing to address the mandatory factors outlined in 18 U.S.C. § 3553(a).

### INTRODUCTION AND OVERVIEW

Mr. Constant fully accepts responsibility for his role and conduct in this case and charge to which he pled guilty. Nothing in this sentencing memorandum is meant to diminish or lessen the voluntariness or factual basis of his plea. However, in negotiating and effectuating Mr. Constant's plea, the Government acquiesced and allowed Mr. Constant to plea to a charge different than the charges originally presented in his information, as he cooperated and provided information supporting his cooperation and claims. In addition, Mr. Constant's culpability is unique from the conduct of those originally believed to be his co-conspirators. Accordingly, the Government allowed Mr. Constant to plead to interstate transportation of stolen money, in violation of 18 U.S.C. § 2314, to an applicable Guidelines offense level of 17, and to 24 to 30 months'

imprisonment. In addition, although both parties agreed that neither a downward or upward departure is warranted and would not be sought, it was agreed that either party may seek a sentence outside of the Stipulated Guidelines Range based on the listed factors in Title 18, United States Code, Section 3553 (a).

Mr. Constant is a fifty-five-year-old man with no prior criminal history. He is married to Meridith, a licensed attorney who has been a stay-at-home mother since the birth of their children, R.C. and S.C, but recently began practicing civil and contract litigation when able. R.C., their son, is a 18-year-old Junior at the local high school who suffers from attention deficit hyperactivity disorder. S.C., their daughter, is a 15-year-old high school freshman who also suffers from attention deficit disorder and is currently undergoing testing as it is believed she has slight autism spectrum disorder. S.C. currently sees both a psychiatrist and therapist. They rent a modest home in a suburb far north of Dallas in order for the children to attend an exemplary public school located in Lovejoy Independent School District. Although the family has lived a comfortable life, at times more comfortable than others, they do not currently—and have never—lived a lavish lifestyle.[1]

---

[1] *See* Presentence Investigation Report starting at Page 20, ¶¶ 114 through 128.

Prior to his arrest in this case, and for the last several years, Mr. Constant has worked as a pilot for a small private charter flight operations located in the Dallas-Forth Worth area due to his military pilot experience (discussed further below). Prior to his employment as a pilot, Mr. Constant pursued several entrepreneurial endeavors including Constant Wealth Management, Coindawg, LLC, and C2, LLC, but never made any substantial wealth as most of his professional endeavors over the course of his life have ended with a net loss. Mr. Constant's recent business, C2, LLC, exchanged fiat currency for Bitcoin currency in exchange for a small fee. It was this business that drew the attention of Brandon Austin and Eugene William "Hugh" Austin. The Austins are not alleged to be co-Defendants of Mr. Constant but are referred to as co-conspirators in the Presentence Investigation Report. The Government describes each individual's conduct in their Related Case Letter dated October 4, 2023, and addressed to the Honorable P. Kevin Castel and the Honorable Jennifer H. Rearden[2], stating:

> "Hugh Austin and Brandon Austin are alleged to have held
> themselves out to be brokers of private Bitcoin exchange
> transactions that did not involve the use of established
> cryptocurrency exchanges. In some instances, once the Austins

---

[2] *See* Exhibit A, "Related Case Letter regarding United *States v. Brandon P. Austin*, 23 Cr. 199 (PKC); *United States v. Charles Riley Constant*, 23 Cr. 379 (PKC); *United States v. Eugene William Austin, Jr., a/k/a "Hugh Austin,"* 23 Cr. 508 (JHR initially).

received victims' investment funds intended for the purchase of Bitcoin, the Austins misappropriated the funds and used it for their own personal benefit. In other instances, the Austins knowingly laundered fraud proceeds for other criminals. In total, the Austins are alleged to have conspired together to defraud multiple victims of an aggregate of millions of dollars.

In April 2023, Brandon Austin pleaded guilty to conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and before Judge Castel, pursuant to a plea agreement with the Government. His sentencing proceeding is currently set for November 8, 2024.

One of Brandon Austin's money laundering schemes involved the proceeds of seven fraudulently obtained COVID-relief loans from the U.S. Small Business Administration. In connection with that scheme, Brandon Austin used the services of Charles Riley Constant, who was a licensed money transmitter with accounts at certain cryptocurrency exchanges. Constant ultimately misappropriated approximately $340,000 of the funds he had agreed to convert to Bitcoin. Constant waived indictment and pleaded guilty before Judge Castel to Information 23 Cr. 379 (PKC), pursuant to a plea agreement with the Government. The

Information charged Constant with interstate transportation of stolen money, in violation of 18 U.S.C. § 2314."

Mr. Constant's character and prior military service, position in the family, acceptance of responsibility, feelings of remorse, role in the offense, and efforts in dealing with various adversities all deserve consideration in reaching a proper sentencing decision. Therefore, we respectfully request that this Court take full consideration of these facts in its sentencing decision.

Mr. Constant wants nothing more than to be part of his wife and children's lives, especially as the children enter their last few years "at home." He understands that his decisions have brought him here. He makes no excuses for his conduct; he only offers context, which we respectfully offer in this memorandum.

## THE APPLICABLE SENTENCING STANDARD

Following *United States v. Booker*, 543 U.S. 220 (2005), the Court must impose a sentence in accordance with 18 U.S.C. § 3553(a) and should no longer presume that a sentence calculated pursuant to the United States Sentencing Guidelines is appropriate.[3] Indeed, the correctly calculated Guidelines range is but one factor for the Court to consider in imposing a sentence. Most significantly, the Court must impose a sentence "sufficient, *but not greater than*

---

[3] *United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007).

*necessary*" to comply with the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2) (emphasis added).[4]  Those purposes include the need "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant."[5]

Pursuant to § 3553(a), courts must also consider several other factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentences available;" and the Guidelines.[6]  Under this sentencing regime, a court should consider all of the relevant sentencing factors, giving no more weight to one factor than to any other factor.  The focus of the regime is thus a sentence based on the whole person before the sentencing court, rather than simply the version of the person reflected in the Guidelines' numbers and grids.

Full consideration of the other factors outlined in § 3553(a), including the fundamental command that the sentence be sufficient, but not greater than necessary to serve the purposes of punishment.

---

[4]  *See also United States v. Foreman*, 436 F.3d 638, 644 n. 1 (6th Cir. 2006) ("[The] district court's job is not to impose a 'reasonable' sentence [but] to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2)'"); *United States v. Tucker*, 473 F.3d 556, 561 (4th Cir. 2007) (same); *United States v. Willis*, 479 F. Supp. 2d 927, 929 (E.D. Wis. 2007) (explaining that "the so-called parsimony provision . . . directs the court to impose the minimum term necessary to comply with the statutory goals of sentencing").

[5]  18 U.S.C. § 3553(a)(2)(A), (B) and (C).

[6]  *Id.* at § 3553(a)(1), (3), and (4); *see also United States v. Simpson*, 430 F.3d 1177, 1186 (D.C. Cir. 2005).

## FACTORS SUPPORTING A SENTENCE
## OUTSIDE THE ADVISORY GUIDELINE RANGE

Several important considerations under § 3553(a) support a sentence outside the advisory guideline range, including as relevant to Mr. Constant the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B. to afford adequate deterrence to criminal conduct;

    C. to protect the public from further crimes of the defendant; and

    D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available; …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

These considerations are discussed in detail below.

# I. Mr. Constant's personal history and characteristics.

The difficult challenge for a sentencing judge is to individually consider every person and craft a punishment that fits the offender, not merely the crime.[7]  This requires "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[8]

Mr. Constant was born on January 13, 1969 in Casa Grande, Arizona to Richard Riley Constant and Virginia Gayle (nee Spradling).[9]  He moved from Casa Grande at age three and was raised primarily in Dallas, Texas, with his two full sisters and later with his adopted brother and two stepsiblings.[10]  As a child, Mr. Constant experienced a "movie-like" childhood that involved the outdoors, livestock, and sports.[11]

Mr. Constant began a relationship with his now wife, Meridith, in 1990 while in college.[12]  The two married in 1999 and both have reported a great marriage.[13]  She continues to be supportive of him despite his current legal issue and the stress it has created for the entire family.[14]

Although Mr. Constant's father passed in 2021, his mother has provided a collateral interview and a letter attached as Exhibit C.  Both communications

---

[7] *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011).
[8] *Koon v. United States*, 518 U.S. 81, 113 (1996).
[9] *See* Presentence Investigation Report at Page 16, ¶ 86.
[10] *See* Presentence Investigation Report at Page 16, ¶¶ 87-90.
[11] *See* Presentence Investigation Report at Page 16, ¶ 91.
[12] *See* Presentence Investigation Report at Page 17, ¶ 94.
[13] *See* Presentence Investigation Report at Page 17, ¶ 94.
[14] *See* Exhibit B, Letter of Meridith Constant, and Presentence Investigation Report at Page 17, ¶¶ 94 and 97.

with Mrs. Constant describe him to be an "overall good person who is generous, helpful, and considerate."[15]

Mr. Constant obtained a bachelor's degree from Texas State University (formerly Southwest Texas State University) in economics in 1992 and later obtained a master's of business administration from the Cox School of Business at Southern Methodist University in 1999.[16] His master's degree was stayed for four years due to his assignment to active military duty, described more thoroughly below.[17] Upon graduating from the Cox School of Business, Mr. Constant held several positions at several different financial institutions, including Fidelity, Citigroup/Smith Barney, Merril Lynch/Bank of America, Wells Fargo, and ultimately as a Senior Vice President at Capital Plan, a high-net worth insurance group.[18] After his employment at Capital Plan, Mr. Constant was involved in several startup business, primarily in the aviation industry, and (based on his experience as a military pilot) and later in the private wealth management and financial industries.[19]

## A.     Mr. Constant is a loving husband, father, son, and brother.

Throughout the years, Mr. Constant and Meridith continued to develop their strong relationship while they began their careers and Mr. Constant

---

[15] *See* Exhibit C, Letter of Virginia Constant and Presentence Investigation Report at Page 17, ¶ 96.
[16] *See* Presentence Investigation Report at Page 19, ¶ ¶ 109-110.
[17] *See* Presentence Investigation Report at Page 19, ¶ 110.
[18] *See* Presentence Investigation Report at Page 21, ¶ ¶ 120-123.
[19] *See* Presentence Investigation Report at Page 21-23, ¶ ¶ 118-128.

began his military service. The two were married in 1999.[20]  Several years later, the two had a son, now a junior in high school, and a daughter, now a freshman in high school.[21]

As evidenced in the letters provided by his wife, Meridith, his mother, Virginia Constant, and sister, Cindy Lakey, he has been an involved and supportive member of their family.[22]  Additionally, Dr. Ray Levy, a psychologist providing services for both of his children, submitted a letter of support documenting Mr. Constant's specific and remarkable support of both children.[23] Specifically, he wanted the Court to know how impressed he is with Mr. Constant and the persistence that he pursues with his children.[24]  Further he notes that Mr. Constant "has been instrumental in providing stability and safety in his home and family."[25]

Meridith's letter is most compelling.  She describes who Chuck is to her, their children, their extended family and all others he has interacted with during his life.  She attributes the success of their children in overcoming substantial challenges to both of them "making personal and family sacrifices to meet their daily academic and therapeutic needs, be them doctors,

---

[20] *See* Presentence Investigation Report at Page 17, ¶ 94.
[21] *See* Presentence Investigation Report at Page 17, ¶ 95.
[22] *See* Exhibit B, Letter of Meridith Constant, Exhibit C, Letter of Virginia Constant, and Exhibit D, Letter of Cindy Lakey.
[23] *See* Exhibit E, Letter of Dr. Ray Levy.
[24] *See* Exhibit E, Letter of Dr. Ray Levy.
[25] *See* Exhibit E, Letter of Dr. Ray Levy.

therapists, tutors, or just beneficial extra-curricular activities, and the daily presence of two parents that love and support them."[26]  She expresses fear and concern about how their lives change as they are "only in the beginning stages of starting over with a new reality and dynamic that often leaves me stretched thin considering the needs of my family and the daily support to which they are all accustomed or in need."[27]  She worries about Chuck missing monumental moments of the children's lives; including "the final few days with our son before he graduates, or potentially our daughter's first date."[28]

## B. Mr. Constant's conduct is inconsistent with his lifetime of law-abiding character.

The offense to which Mr. Constant pleaded guilty and the conduct underlying it are completely inconsistent with his character.  Upon learning of her husband's arrest, Mr. Constant's wife, Meridith, was in disbelief and found the allegations "deeply shocking, disturbing, and frustrating."[29] She, along with others in his life, have only known him to be moral, dependable, and upstanding.

To illustrate his good moral character, his sister, Cindy Lakey recounts a story after their passing of their father, a Colonel in the Air Force Reserves, stating "... Chuck spent countless hours reviewing Dad's military documents

---

[26] *See* Exhibit B, Letter of Meridith Constant.
[27] *See* Exhibit B, Letter of Meridith Constant.
[28] *See* Exhibit B, Letter of Meridith Constant.
[29] *See* Exhibit B, Letter of Meridith Constant.

and letters regarding his years in service. Chuck completed mounds of paperwork, talked with Dad's former F-16 fighter unit, and conversed with multiple people. Chuck wanted to honor Dad with the rate military honor of a fighter jet Fly Over at the funeral. ... Chuck persevered to apply for this honor for Dad. Ultimately approval was granted."[30]  This dedication to the honor of his late father exemplifies his good moral character.

### C.   Mr. Constant's conduct is inconsistent with his decades of military service.

The offense to which Mr. Constant pleaded guilty and the conduct underlying it are completely inconsistent with his character and his life-long history of being a law-abiding citizen.[31]  Outside of the letters from those who are closest to Mr. Constant, he has a decorated military history and retired as a Major from the U.S. Air Force Reserves in 2015.[32]

His awards and commendations as a pilot are numerous but the highlights include the Meritorious Service Medal, Air Medal, National Defense Service Medal, and the Global War on Terrorism Expeditionary Medal.[33]

During his service, he was on active duty as an officer trainee and then as a pilot. He was deployed overseas twice, once to Kuwait and one to Afghanistan, as a pilot handling classified systems. After twenty (20) years of

---

[30] *See* Exhibit D, Letter of Cindy Lakey.
[31] *See* Presentence Investigation Report at 15, ¶ ¶ 78-84 (clean criminal record).
[32] *See* Presentence Investigation Report at 20, ¶ 112.
[33] *See* Presentence Investigation Report at 20, ¶ 112.

service to our country, Mr. Constant retired from the Air Force Reserves in 2015.[34]

## II. Mr. Constant accepts responsibility for his conduct, but the nature and circumstances of his role in the offense are relevant.

It is undisputed that the primary bad actors involved here are Brandon Austin and Eugene William "Hugh" Austin. Again, in the letter regarding reassignment of cases dated October 4, 2023, the Government writes:

> "Hugh Austin and Brandon Austin are alleged to have held themselves out to be brokers of private Bitcoin exchange transactions that did not involve the use of established cryptocurrency exchanges. In some instances, once the Austins received victims' investment funds intended for the purchase of Bitcoin, the Austins misappropriated the funds and used it for their own personal benefit. In other instances, the Austins knowingly laundered fraud proceeds for other criminals. In total, the Austins are alleged to have conspired together to defraud multiple victims of an aggregate of millions of dollars.

> In April 2023, Brandon Austin pleaded guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h),

---

[34] *See* Presentence Investigation Report at 20, ¶ 112.

before Judge Castel, pursuant to a plea agreement with the Government. …

One of Brandon Austin's money laundering schemes involved the proceeds of seven fraudulently obtained COVID-relief loans from the U.S. Small Business Administration. In connection with that scheme, Brandon Austin used the services of Charles Riley Constant, who was a licensed money transmitter with accounts at certain cryptocurrency exchanges. Constant ultimately misappropriated approximately $340,000 of the funds he had agreed to convert to Bitcoin. Constant waived indictment and pleaded guilty before Judge Castel to Information 23 Cr. 379 (PKC), pursuant to a plea agreement with the Government. The Information charged Constant with interstate transportation of stolen money, in violation of 18 U.S.C. § 2314. …

Hugh Austin was indicted by a Grand Jury in this District today. His case was wheeled out to Judge Rearden. Indictment 23 Cr. 508 (JHR) charges Hugh Austin with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Two), and conspiracy to commit interstate transportation of stolen property, in violation of 18 U.S.C. § 371 (Count Three). At

trial, the Government anticipates that the evidence will show that Hugh Austin and Brandon Austin conspired with each other to commit the charged crimes."[35]

Mr. Constant has written a letter to the Court, attached as Exhibit F, to explain the chain of events and legitimate business opportunities that first introduced him to the Austins. He explains how he was introduced to the Austin by a Director of his company, C2, and how had no reason to believe they were not trustworthy or sincere.[36] At one point, he reached out to Bank of America and the Small Business Administration in order to obtain more information as to source and legitimacy of those funds.[37] After several months, he used what he believed to be legitimately earned commissions to purchase Bitcoin ATMs and then later directed the remainder of the funds in that business to provide liquidity and pay other bills.[38]

We respectfully submit that all this evidence demonstrates Mr. Constant did not know that the funds he retained and converted were Small Business Administration Loans, but rather learned later they were. In this way, Mr. Constant's culpability is not at the same level as the co-defendants who

---

[35] *See* Exhibit A, "Related Case Letter regarding United *States v. Brandon P. Austin*, 23 Cr. 199 (PKC) ; *United States v. Charles Riley Constant*, 23 Cr. 379 (PKC); *United States v. Eugene William Austin, Jr., a/k/a "Hugh Austin,"* 23 Cr. 508 (JHR initially).

[36] *See* Exhibit F, Letter of Charles Riley Constant.

[37] *See* Exhibit F, Letter of Charles Riley Constant.

[38] *See* Exhibit F, Letter of Charles Riley Constant.

knowingly participated in the massive money laundering scheme from day one, although he still committed the offense of "interstate transportation of stolen money," in violation of 18 U.S.C. § 2314, by converting those funds.[39]

Again, Mr. Constant accepts responsibility for being willfully blind, ignoring red flags and ultimately retaining roughly $340,000 in funds that did not belong to him but was used by him for business purposes.

## III. The purpose of sentencing—18 U.S.C. § 3553(a)(2).

The goal of sentencing is to impose a sentence that is "sufficient, but not greater than necessary" considering the sentencing goals of retribution, deterrence, protecting the public, and rehabilitation.[40]

### A. Seriousness of the offense, respect for the law, and just punishment.

Mr. Constant absolutely recognizes that he has committed a serious offense.[41] But excessive punishment, like insufficient punishment, can diminish respect for the law.[42] And there is "no legitimate reason" for punishment "solely for the sake of punishment."[43] As the Supreme Court

---

[39] *See* Robin Charlow, *Wilful Ignorance and Criminal Culpability*, 70 TEXAS L. REV. 1351, 1423 (1992) (stating that a person who is certain that his conduct is criminal is more culpable than one who is only aware with a high probability that that is the case. In sum, the certain actor is more dangerous because he is less deterrable insofar as he has shown his willingness to violate the law and is more callous in his disregard for the law).

[40] 18 U.S.C. § 3553(a)(2).

[41] *See* Presentence Investigation Report at 43-44, ¶ 118.

[42] *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.").

[43] *Magluta v. Samples*, 375 F.3d 1269, 1276 (11th Cir. 2004).

declared in 1949, "[r]etribution is no longer the dominant objective of the criminal law."[44]

Society gains very little by having Mr. Constant incarcerated for an extended period of time. He is capable of working, providing for his family, and being a productive citizen. Unlike others with less favorable circumstances, Mr. Constant can live an honest life because he has a college and master's degree[45] and extensive professional experience.[46] Even more, since his arrest, he has complied with all pretrial supervision requirements.[47] After weighing all these positive factors, a minimal, yet deterring sentence is appropriate.

## B. Achieving deterrence, rehabilitation, and assuring Mr. Constant does not reoffend.

Achieving deterrence is certainly an important sentencing goal, but a guideline range sentence is not necessary to meet that goal. Nothing in §3553(a) "require[s] the goal of deterrence be met through a period of incarceration."[48] And "there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on

---

[44] *Williams v. People of State of NY*, 337 U.S. 241, 248 (1949).
[45] *See* Presentence Investigation Report at 19, ¶ ¶ 109-110.
[46] *See* Presentence Investigation Report at 20-22, ¶ ¶ 114-128.
[47] *See* Presentence Investigation Report at 5, ¶ 6.
[48] *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010).

potential white-collar offenders."[49]  Deterrence and rehabilitation have become paramount goals of sentencing, especially for non-violent offenders like Mr. Constant.

First, Mr. Constant is not a threat to reoffend.  Mr. Constant is a 54-year-old man with no criminal history, and he will never again meaningfully engage in the financial industry, based on his agreement to permanently cease and refrain from operating or assisting a money transmitting business and from applying to the U.S. Treasury Department for a license to operate a money transmitting business.  In *Gaind*, the court held that the destruction of defendant's business, through which he perpetrated his crimes, justified a downward departure since it served the purposes of public protection and specific and general deterrence.[50]  *Gaind* further held that the destruction of the business reduced the need to achieve the purposes of sentencing through the sentence itself.[51]  In the same way, Mr. Constant lost his ability to ever operate or assist a money transmitting business, thus preventing him from ever committing this type of crime again.

---

[49]  Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448–49 (2007). Counsel for Mr. Constant respectfully submits that the elements and conduct underlying his criminal activity are more similar to that of other, more traditional white collar crimes.

[50]  *United States v. Gaind*, 829 F. Supp. 669, 670-71 (E.D.N.Y. 1993).

[51]  *See id.* at 671.

Second, Mr. Constant's "need to provide support for [his] family will provide adequate deterrence against any potential future criminal conduct."[52] If he is incarcerated, it will certainly impact his wife's ability to care for their children and his ability to take care of his family, emotionally and financially, and his aging mother.[53]

The Supreme Court recently held in *Tapia* that "a court may not impose or lengthen a prison sentence . . . to promote rehabilitation."[54] And *Tapia*'s core reasoning—that prison time does not rehabilitate—is borne out by the Sentencing Commission's most recent and most comprehensive study on recidivism. A few points from the study are pertinent. First, the Commission found that among 25,431 offenders—the largest group of any prior Commission study—those "with shorter lengths of imprisonment generally had lower recidivism rates."[55] Of the offenders sentenced to prison, the group with the lowest rate of recidivism (37.5%) served less than six months incarceration.[56] And those who received probationary sentences had an even lower rate of 35.1%.[57] And while one could argue that such individuals received lower sentences and, therefore, were more likely to be first-time offenders, that too

---

[52] *United States v. Olis*, No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (unpublished).
[53] *See* Exhibit B, Letter of Meridith Constant.
[54] *Tapia v. United States*, 564 U.S. 319, 335 (2011).
[55] U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 22, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.
[56] *Id.* at 5, 22.
[57] *Id.* at 5.

# CONCLUSION

Mr. Constant desires to do what is right and has remained a caring and devoted father and husband, even in this most troubling time. In addition to Mr. Constant's history of support to his family and country, his having successfully obeyed every condition of pretrial release for approximately a year, his lack of criminal history, and minimal involvement compared to the egregious and greedy criminal schemes of both Brandon and Hugh Austin should all assure the Court that he is not a threat to reoffend.

Respectfully submitted,

**MCCATHERN, PLLC**
3710 Rawlins, Suite 1600
Dallas, Texas 75219

One Cowboys Way, Suite 175
Frisco, Texas 75034
Tel: (214) 741-2662
Fax: (214) 741-4717

Jennifer L. Falk
State Bar No. 24055465
jfalk@mccathernlaw.com

**ATTORNEY FOR DEFENDANT**
**CHARLES RILEY CONSTANT**

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2024, I electronically filed the foregoing document with the Clerk of Court of the U.S. District Court for the Southern District of New York, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorney for the Government.

_____
Jennifer L. Falk

# Exhibit A



October 4, 2023

<u>BY ELECTRONIC MAIL</u>

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

The Honorable Jennifer H. Rearden
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> **Re:  *United States v. Brandon P. Austin*, 23 Cr. 199 (PKC)**
> ***United States v. Charles Riley Constant*, 23 Cr. 379 (PKC)**
> ***United States v. Eugene William Austin, Jr., a/k/a "Hugh Austin,"* 23 Cr. 508 (JHR)**

Dear Judge Castel and Judge Rearden:

The Government respectfully submits this letter in accordance with the Court's procedure regarding factually related cases that are pending before different judges and to request that an arraignment and initial conference be set for defendant Eugene William Austin, Jr. ("Hugh Austin"). Hugh Austin, who has been charged in *United States v. Eugene William Austin, Jr.,* Indictment 23 Cr. 508 (JHR), is the father of the defendant in *United States v. Brandon P. Austin*, 23 Cr. 199 (PKC).  Hugh Austin and Brandon Austin are alleged to have held themselves out to be brokers of private Bitcoin exchange transactions that did not involve the use of established cryptocurrency exchanges.  In some instances, once the Austins received victims' investment funds intended for the purchase of Bitcoin, the Austins misappropriated the funds and used it for their own personal benefit. In other instances, the Austins knowingly laundered fraud proceeds for other criminals.  In total, the Austins are alleged to have conspired together to defraud multiple victims of an aggregate of millions of dollars.

In April 2023, Brandon Austin pleaded guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), before Judge Castel, pursuant to a plea agreement with the Government.  His sentencing proceeding is currently set for November 8, 2023.

One of Brandon Austin's money laundering schemes involved the proceeds of seven fraudulently obtained COVID-relief loans from the U.S. Small Business Administration.  In connection with that scheme, Brandon Austin used the services of Charles Riley Constant, who was a licensed money transmitter with accounts at certain cryptocurrency exchanges.  Constant ultimately misappropriated approximately $340,000 of the funds he had agreed to convert to Bitcoin.  Constant

waived indictment and pleaded guilty before Judge Castel to Information 23 Cr. 379 (PKC), pursuant to a plea agreement with the Government. The Information charged Constant with interstate transportation of stolen money, in violation of 18 U.S.C. § 2314. Constant's case was initially wheeled out to Judge Jesse Furman, but was reassigned to Judge Castel as related to the matter against Brandon Austin. Constant's sentencing is currently scheduled for November 16, 2023.

Hugh Austin was indicted by a Grand Jury in this District today. His case was wheeled out to Judge Rearden. Indictment 23 Cr. 508 (JHR) charges Hugh Austin with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Two), and conspiracy to commit interstate transportation of stolen property, in violation of 18 U.S.C. § 371 (Count Three). At trial, the Government anticipates that the evidence will show that Hugh Austin and Brandon Austin conspired with each other to commit the charged crimes.

Because Brandon Austin's and Hugh Austin's offense conduct substantially overlaps, as summarized above, we submit this letter so that Your Honors can consider whether it would be advantageous for both cases to be handled by the same Court.

We further request that an arraignment and initial conference for Hugh Austin be scheduled for next week. The parties are available on Tuesday, October 10, 2023, from 1pm to 3:30pm, or Thursday, October 12, 2023, from 12 noon to 5pm.

Finally, the Government respectfully requests that the time from the date of this letter to the date of the initial conference be excluded from the running of the Speedy Trial Act clock, pursuant to Title 18 U.S.C. § 3161(h)(7)(A). Such a continuance serves the ends of justice and outweighs the interests of the public and the defendant in a speedy trial because it would allow the Government to begin producing discovery, the defense to review discovery, and for the parties to discuss a potential disposition of the case. Defendant Hugh Austin, through counsel, consents to this request.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:      /s/ Sarah Lai
         Andrew K. Chan
         Sarah Lai
         Assistant United States Attorneys
         Tel: (212) 637-1944 / 1072

cc: David Bertan, Esq.
    Counsel for defendant Eugene William Austin, Jr.

    Andrew Dalack, Esq.
    Counsel for defendant Brandon P. Austin

    Jennifer Falk, Esq.
    Counsel for defendant Charles Riley Constant

Exhibit B

April 10, 2024

Dear Judge Castel -

My name is Meridith Constant, and I am the wife of Charles "Chuck" Constant.  I am writing this letter of support to help the court more fully understand who Chuck is to me, who we are as a family, and how the present circumstances that places Chuck's liberty in question is not indicative, in any way, of the life he has led and the life I know he will continue to lead if given a chance.  In summary, Chuck's personal life and the entirety of his professional experience, be it through his military career or in business, has been conducted with the mindset of providing service to others before self, and fighting for what is right, even when it comes at great personal sacrifice.  It is with this in mind that I believe Chuck made the choice to accept responsibility for his actions.  And it is for this reason that I specifically ask you consider the entirety of his life, the lives of his children who need their father, the isolation of the circumstance and the mitigating facts of this case that have swayed me to continue my support for Chuck, and the financial impact his association and involvement with the Austins, who I hope the court agrees deserve no mercy, will forever change and cloud our lives moving forward.

Chuck and I met in college nearly 34 years ago, on a blind date set up by mutual friends and we have been married for nearly 25 years.  I describe Chuck as the yen, to my yang. Despite both our parents divorcing when we were young, and growing up in blended families, his family dynamics were happy and "movie-like," whereas mine were chaotic and filled with dysfunction.  Chuck's raw intelligence and dry wit is more akin to an introvert, whereas I am more extroverted.  He has always been "a good 'ole country boy," with big dreams and a belief that it still means something to say your word is your bond. He trusts people.  And he approaches life with optimism, sometimes misplaced in my opinion.  In contrast, I had a world of hurt and heartache from childhood that has left me with a distrust of most and an appreciation that one should trust but only after first verifying.  It is not therefore surprising that his entrepreneurial spirit has caused the most significant sources of our marital disagreements.  I have 34 years of experience listening to his business ideas, which often have proven to be fruitful – just not for us.  I have experienced his optimism and suffered the monetary loss that comes with his freedom, courage, and willingness to take the risk of starting a business.  I have witnessed him stand up for others, only to suffer retaliation for speaking truth.  I have watched as other less scrupulous people have taken advantage of his honesty and used it for their advantage, and to his detriment.  But despite our disagreements, one thing has always remained true – I believe, at his core, he is a good man with good intentions.  And, in today's world that is hard to come by.

In addition to being my husband, he is the father to our two minor children, who are in high school and respectively in 11th and 9th grade. Chuck has always been a pillar of support for our children, offering guidance, assistance, and compassion whenever needed. Relative to our children, he is the voice in our home that speaks softly but carries the big stick. Both children are "twice exceptional" or "2E." What this means is that they are highly intelligent/gifted children who also suffer from significant social-emotional learning disorders. They need a special combination of strong/challenging educational programs and counseling/social-emotional/learning support. As a result, both are now or have been in the care of various medical doctors and therapists since early elementary ages. Approximately six years ago, we relocated just north of the Dallas-Fort Worth metroplex so our children could benefit from an exemplary public school district that furthers their academic development and challenges their interests, while also offering them a small and manageable social structure that permits them to meet their social-emotional needs. Considering all the challenges they have endured and overcome, Chuck and I are beyond proud of their accomplishments. And I personally attribute their success in life to both of us making personal and family sacrifices to meet their daily academic and therapeutic needs, be them doctors, therapists, tutors, or just beneficial extra-curricular activities, and the daily presence of two parents that love and support them and meet them where they are. Chuck is always using his experience as a military academy liaison officer to impart on our children lessons of knowing who you associate with and the benefits of projecting a positive brand. The day that his children learn of his current situation will be discussed with careful self-reflection and the admonition of letting this be a lesson to them. I know Chuck has no desire to miss even one day away from ███ and ███ – and I believe the thought of missing the final few days with our son before he graduates, or potentially our daughter's first date, is more punishment than any incarceration could reap. I also see how the weight of his present circumstance has upended our life as we have known it, and I fear the consequences have yet to be fully revealed. He is a great father, by any measure, and regardless of the matter that brings us to this day, I do not regret him being their father.

For both of us, our extended family is everything. For 34 years his parents have been mine and vice versa. Weekends and holidays, for us, are often spent with family at large family gatherings. Our children have known no different, and their lives are filled with memories of large family meals and games with their cousins – who are often 10 years or more their elder. So, although our move north within the metroplex (discussed above) lengthened the distance from my mother and stepfather, it provided us the opportunity to be an hour closer to Chuck's father who was at the time suffering, but has since passed, from the late stages of Parkinson's Disease. I am grateful Chuck could be present and available to his father and stepmother in their time of need, and still only 30 minutes from my mother. This is key, as my mother was recently diagnosed with acute onset dementia that is

aggressive. As such, both Chuck and I have had or continue to have significant involvement in the daily care of our ailing and aging parents. Since March 22, 2023, however our engagement with family has been quite different, as the arrest has divided family, on both sides. For some, the mere association with a criminal element is enough to ask for Chuck to not be present. For others, there is anger for his choices bleeding into and affecting the lives of me and our children. And for those personally impacted because they received federal subpoenas, there is resentment and the demand to remain distant until the subpoenas are lifted. These wounds will take time to heal, and time away from family does not offer what little time he may have left to repair the wounds.

While I understand the seriousness of the allegations, and it is deeply shocking, disturbing, and frustrating to see Chuck entangled in any criminal proceeding, I believe firmly in the principle of innocent until proven guilty. This process has taught me a lot about my assumptions of criminal justice in this country – and it is not all good. Nevertheless, I understand that Chuck has chosen to accept responsibility for his actions that resulted in him using SBA funds for business expenses; and to pay what he believed were duly earned and legitimate commissions which were in turn used to start a new business venture; and he has plead guilty rather than pursue his right to a trial on the merits. So, I believe this case highlights the importance of considering the context and complexities surrounding white-collar crimes, which often involve nuanced financial transactions and interpretations of the law. In this regard, while not seeking to excuse Chuck's actions, I think it is important to provide context. He was not a principal participant as originally presented by the prosecutors in the criminal complaint[1] – he was unwittingly used by the Austins. He applied the wealth of his knowledge and experience that would be acceptable business practice in any multinational bank or other financial institution to insure proper KYC and AML. He had no knowledge or indication of an inconsistency in the instructions/source of funds until the after the funds cleared. He took immediate steps to report and investigate the red flags the moment he became aware. And in the absence of a response and in the face of continued lies from the principal actors, he naively believed the funds were the source of a business dispute – not illegitimately gotten gains. It is my belief, after a review of the evidence, that the Austins lied to him and assured him that their client had proper control of the funds and that the funds were legitimately obtained. It is clear from my reading of Hugh Austin's criminal information that, when in direct consideration of Chuck's evidence (supplied and in the possession of the prosecutors), their statements cannot in hindsight be taken as true. But he has ultimately admitted to using the funds for business purposes and we now know that those funds were

---

[1] I would like the court to further take note that the criminal complaint and the accompanying public press release is forever part of the public record that cannot be erased; and, for anyone who does not know him, the news and allegations are enough to deem him guilty of crimes far more sinister than he is truly guilty of or that could ever be proved.

fraudulently obtained.  Had anyone called, inclusive of the alleged attorney who sent the initial transaction and is now being used to help in the prosecution of Hugh Austin – I can assure you we would not be where we are today.  Had he been a principal – I can assure you I would not be standing by him.  Had I not read the texts and emails on my own – I can assure you I would not be standing by him.  Had I not heard the recorded calls with the SBA to investigate – I would not be supporting him.  So, in summary, I respect his decision to accept responsibility, but believe strongly that he lacks a criminal mind that demands public protection.

Chuck has expressed remorse for the unintended consequences that have arisen, and he has fully cooperated with the authorities to resolve the matter responsibly.  He understands the gravity of the situation.  Chuck made no excuses.  He commits to taking the steps of forever walking away from the entirety of his professional experience in the financial markets to make amends and prevent similar occurrences in the future.  He has fully and without issue complied with the bond provisions.  He has offered assistance in any way he can to help prosecute the principal actors who clearly acted with true conscious indifference to the rule of law and with criminal intent.  He will never again get to enjoy a hunting trip with our children during Thanksgiving or on his birthday (some of his favorite memories in life), as he cannot possess a gun.  He will never again get to vote or serve on a jury, despite his 20 years of service to fight for others' freedom.  And the list could go on.  He stands before you today a man willing to take accountability.  He seeks to be forgiven by his family and bridge all familial divides.  And I mean no disrespect to this court and its power and authority to adjudicate this proceeding within the rule of law, but any public punishment merited out by this Court cannot come close to the loss of all the liberties he once fully enjoyed and fought mightily for all in our country to have or the taint that he bears with his family.

I therefore urge you to consider the entirety of Chuck's life and character when evaluating his case.  I firmly believe he deserves a fair and just resolution that specifically accounts for the lack of intent behind his actions.  I ask that you consider the attempts he made to discover information about the source of funds and the companies they were connected to upon becoming concerned, and weighing in on whether the same outcome would occur had even one person answered or responded as he was told to expect.  I urge you to contemplate fully what ends are served by incarceration in the face of this reality, when life as he has always known can never be the same, literally, figuratively, or financially.  I urge you to consider the needs of me and our children as we are only in the beginning stages of starting over with a new reality and dynamic that often leaves me stretched thin considering the needs of my family and the daily support to which they all are accustomed or in need.

Thank you for taking the time to read this letter and for considering my perspective. If there is any additional information I can provide, please do not hesitate to contact me. I will be in court on the day of his sentencing to offer him my undying support.

With respect,

Meridith Constant

# Exhibit C

October 24, 2023

To: The Honorable P. Kevin Castel
United States District Judge
Southern District of New York

Re: Character of Charles (Chuck) Riley Constant

Dear Judge Castel,

Chuck is a good son, brother, husband, father, and friend. He is kind and generous, giving of himself and his time to willingly help his family and friends when there is a need.

My son has always given me help and taken care of any concern of mine, whether requested or not. He is completely dependable.

He has been caring and supportive with his brother and sisters, keeping in touch with them and assisting in any way he can.

His loving and patient devotion to his wife is seen in their marriage.

Being a father is the ultimate joy of his life. He is always there for them. Listening, watching, supporting, teaching, and loving his son and daughter.

He has loyal friends from high school, college, and the military, maintaining their friendship through the years.

He achieved his goal of becoming a fighter pilot in the Air Force, flying the A-10, through perserverance and determination. It is an accomplishment of which I am extremely proud.

Chuck is a good man.


Sincerely,

Virginia G. Constant

# Exhibit D

Honorable P. Kevin Castel
C/o Jennifer Falk
McCathern Law
3710 Rawlins St. Ste 1600
Dallas, TX 75219
Re: Charles Riley Constant

Oct. 25, 2023

Dear Judge Castel,

As Chuck's older sister, I have seen Chuck as a very attentive and involved father with his two children, ███ and ███. Throughout their lives he has frequently driven them to activities, attended their games and competitions, and encouraged them to excel at school. As a committed and loving father, he teaches them to work hard, be kind, and value family.

Chuck strongly resembles our dad both physically as well as with his commitment to serve. Our Dad (Richard Riley) passed away in May 2021. He was a flight surgeon with more than 2,000 flying hours in the F-16, F-15 and other aircraft. He was a Colonel in the Air Force Reserves. Dad's dedicated service inspired Chuck to become an A-10 pilot in the Air Force. Chuck spent many years serving our country in this capacity.

When our dad passed away in 2021, Chuck spent countless hours reviewing Dad's military documents and letters regarding his years in service. Chuck completed mounds of paperwork, talked with Dad's former F-16 fighter unit, and conversed with multiple people. Chuck wanted to honor Dad with the rare military honor of a fighter jet Fly Over at the funeral. Gaining approval for this was a long and complicated process as Fly Overs are usually relegated to a small group of servicemen including 3/4 star generals, former prisoners of war, and Medal of Honor recipients. Chuck persevered to apply for this honor for Dad.

Ultimately approval was granted. A team of F-16 fighter jets flew over the funeral in honor of our dad, Colonel Constant. This was Chuck's greatest gift to dad and just one of the many examples of Chuck's love for his family and commitment to honor.

Thank you,

*Cindy Lakey*

Cindy Lakey RN MSN CWOCN
St. Louis, MO

# Exhibit E

January 29, 2024

RE: In support of Chuck Constant

To Whom It May Concern,

As a clinical psychologist, I have been practicing in Dallas Texas for close to 50 years. I met the Constant family over a decade ago and have been seeing them on and off since then. Mr. Constant is presently employed as a pilot. He is married with two children who are in high school.

Often, when doing therapy with adolescents, parents must be involved. With each session, Mr. Constant showed up and was willing to be open and present with his children in therapy. He demonstrated both emotional fortitude and a strong desire to be an outstanding father. When I recommended a technique or a different approach to his children, he always followed through. Mr. Constant presented himself as levelheaded, measured, and open to new approaches to problem-solving. It was clear to me that his main driving force was his dedication to his family.

While I understand that he is in the mist of legal complications, I wanted the court to know how impressed I am with Mr. Constant and the persistence that he pursues with his children. He has been instrumental in providing stability and safety in his home and family.

I would hope that you would give my recommendation of Mr. Constant consideration for his upcoming court appearance.

Sincerely,

Ray Levy, Ph.D.

17110 Dallas Parkway
Suite 290
Dallas, Texas 75248

(972) 407-1191
Fax (972) 407-1305
Email: Ray@DrRayLevy.com

www.DrRayLevy.com

# Exhibit F

Dear Judge Castel,

As I stand before the Court for sentencing, I want to apologize for my actions and also give context to who I am and what I did.

By way of background, I was born in Arizona but my family moved to Texas at a young age. I had a wholesome upbringing within a large family and endeavored to provide the same upbringing for my family. After graduating from Texas State university in 1992, I later obtained my master's in business administration from Southern Methodist University in 1999. During that time, I joined the Air Force and then Air Force reserves and served twenty years as a pilot in the Air Force Reserves, including deployments to Kuwait and Afgahanistan. I also mentored and interviewed Air Force Academy candidates as a Liaison Officer and also served as the Congressional Officer working with all the North Texas congressmen regarding Acadmey appointments. While I am proud of my military service, I am more proud of my accomplishments as a husband and a father. My wife and I met on a blind date while in college. After dating while we finished school and she graduated from law school at Tulsa Law, we were married and later had two children. ████, my son, is a junior in high school and ████ my daughter, is a freshman. We rent a modest home in a suburb of Dallas and I am the primary wage earner for our family. I enjoy being outside with the family, whether fishing, hunting or hiking and teaching the kids about their civic responsibility. However, I will never be able to go hunting with them again nor participate in many civic duties. I am embarrassed and ashamed at my conduct that is now taking me from the people I love the most and prevent me from providing and caring for them. At the end of the day, I should not have kept the funds that were not mine to keep, as detailed further below. I should have sent the funds I retained and ultimately converted, to an attorney to hold while doing research and should have been more diligent in continuing my contact with the Small Business Administration and Bank of America.

I have been in financial services for almost 30 years, encompassing various roles such as Financial Advisor, Compliance Officer and Executive with the some of the world's largest banking and financial firms. In 2018, I joined others to work at C2, LLC, a firm that could be trusted and bring FINRA level oversight to help buyers/sellers conduct trusted cryptocurrency transactions utilizing escrow agents and banks to ensure compliant transactions in a growing new industry. C2 had a fully compliant lengthy Anti-Money Laundering, Due Diligence and Know Your Client program adopted from FINRA best practices and compliant with all regulations in 2020.

In 2020, I was the manager at C2, LLC, which was legitimately involved in private bitcoin transactions for buyers and sellers. Through one of the Directors of C2, I was introduced to the Austins who presented themselves as legitimate brokers. I never at any time had a reason to believe they were not trustworthy or sincere. Furthermore, after trying to make C2 a successful business for two years the owner's began the process to close the company late 2019/early 2020.

However, in June 2020, the Austins approached me to conduct a purchase for a Buyer's attorney and they provided all legally required KYC and documentation for the client and disclosed that the Buyer's funds would come directly from Chase Bank, which can legally be relied upon as another source to verify the legitimacy of an account holder/buyer. This was and is still a common compliance practice amongst major financial institutions.

On June 18, 2020, those funds from the Buyer's attorney were received by wire and the transaction was conducted in accordance with the agreements between the Buyer's attorney and C2, LLC. As part of the normal course of transactions a final PO/confirmation was sent and signed whereby the Buyer attested to the fact that the funds were legitimate and not from illicit sources. It was conveyed to me that the attorney and brokers were happy with how smoothly the transaction went.

In July 2020, the Austins contacted me again and stated the same Buyer's attorney wanted to conduct additional purchases through C2, LLC. Those funds began arriving in multiple tranches and C2 began conducting the transactions as before, while also retaining the estimated commissions to be distributed upon final purchase confirmation. C2 was setup with multiple bank accounts and multiple exchanges to partner in an effort to find best pricing for transactions. This is a very common practice in the securities industry. Operating in this manner does not ever circumvent banking Anti-Money Laundering checks, which are to be conducted on all wire transactions regardless of amount. Furthermore, commercial banks want customers to retain profits and build deposit balances. This is the legitimate/customary process of "seasoning" an account/relationship at a commercial bank and has been a long-standing expectation of commercial banks.

Later, after reviewing the "posted" wire descriptions from the previous days transactions, I noticed the fund descriptions were not anything I recognized. It was then, I contacted Bank of America around July 13, 2020 to inquire as to the nature of the descriptions and attempt to verify the source was from Chase or the Buyer's attorney. Bank of America was unable to provide information other than the wires appeared to be EIDL loans, involving the Small Business Administration. I was somewhat familiar with what the EIDL program was, since I had attempted to apply for relief for other companies I was involved in, but did not have any success in ever getting those companies approved, as the process was very involved and difficult.

Over the course of several days/ weeks I had multiple calls with the Austins and attempts to discuss the wires with the SBA to determine which of the Buyer's companies the loans were issued to. I called and emailed the SBA, but they were not helpful and would not disclose any information. The Austins continued to assure me the wires were legitimate, belonged to the Buyer and that there were no concerns. They also assured me the Buyer would provide additional supporting documentation to help allocate which subsidiaries the wires belonged to. At no time was there any evidence or concerns expressed to me by Bank of America, the SBA or Austins.

The dispute between C2/Buyer intensified and ultimately the Buyer via the Austins refused to provide any additional documentation but continued to maintain their position. In August, I finally made contact with someone at the SBA who indicated they would try to help. After multiple emails and recorded calls (provided to prosecutors), the SBA did not express any concerns over the legitimacy of the funds and given my experience with past dealings with the SBA, I believed it was unrealistic that the funds were not legitimate.

In October 2020, Coindawg, LLC was opened as a legitimate business to conduct legal Bitcoin ATM transactions and I became an administrator for the company. Coindawg had a fully

compliant Anti-Money Laundering / Know Your Client program derived from FINRA best practices. C2, LLC earned commissions owed to the owner of Coindawg, LLC and those were used to purchase 3 ATMs for Coindawg. In addition, Coindawg had operating franchise agreements with several other companies to operate independently purchased Bitcoin ATMs on their behalf. These independent ATMs/cash were all seized by the government and both busineses are defunct to include my Financial Advisory business. I have lost everything as a result of my decisions and going forward, will never again be able to particpate in an industry I have known for 30 years.

With the ongoing dispute regarding the final Buyer's transaction of $299,800, C2, LLC retained the funds, and I paid out the earned commissions from the previously completed transactions of $39,844 to the owner of Coindawg, LLC per agreement, which was used to purchase ATMs and provide liquidity to start that business. Into 2021, I directed C2 to use the retained funds to provide liquidity to Coindawg and pay other bills on behalf of the owners of C2, LLC and Coindawg, LLC.

At no time, until my arrest did I suspect/know the funds wired to C2 were fraudulently obtained. No one I ever spoke to in 2020 indicated the funds were illicit. I also recorded the receipt of those funds on C2's 2020 tax return.

I do sincerely apologize for my inability to better ascertain the nature of the transactions and should have sent the funds to my attorney to hold/further research and should have been more diligent with continuing to contact the SBA and Bank of America. I will be forever remorseful for my decisions in not doing so and, more importantly, later converting that money for my own use.

Sincerely,

$C \angle_7 C_{\Longrightarrow}$

Charles Constant (Apr 10, 2024 22:29 CDT)

Charles Constant

# 2024.04.10 - CC Letter to Court

Final Audit Report                                                  2024-04-11

| | |
|---|---|
| Created: | 2024-04-11 |
| By: | Meridith Constant (mconstant@constant-law.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAibfOqUR87uZfYDD2KH5nKOz3qTggk3CX |

## "2024.04.10 - CC Letter to Court" History

🖰 Document created by Meridith Constant (mconstant@constant-law.com)
2024-04-11 - 3:27:36 AM GMT- IP address: 209.55.113.35

🖂 Document emailed to Charles Constant (chuck.picket@gmail.com) for signature
2024-04-11 - 3:27:38 AM GMT

🖰 Email viewed by Charles Constant (chuck.picket@gmail.com)
2024-04-11 - 3:29:04 AM GMT- IP address: 66.249.80.194

✒ Document e-signed by Charles Constant (chuck.picket@gmail.com)
Signature Date: 2024-04-11 - 3:29:33 AM GMT - Time Source: server- IP address: 209.55.113.35

✅ Agreement completed.
2024-04-11 - 3:29:33 AM GMT

📄 **Adobe Acrobat Sign**